| | |
|---|---|
| PCM SALES, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. _____ ) ) |
| VANTAGE POINT CORPORATION, | ) ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff PCM Sales, Inc. ("PCM"), by its undersigned counsel, hereby commences this suit against Defendant Vantage Point Corporation ("VPC"). PCM makes the following allegations based upon personal knowledge, information and belief, and its attorneys' reasonable investigative efforts as to VPC's actions and misconduct, and states and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. PCM is a California corporation with its corporate headquarters in El Segundo, California.

2. PCM is a wholly-owned subsidiary of PCM, Inc., a Delaware corporation with its headquarters in El Segundo, California. PCM, together with PCM and its other wholly-owned subsidiaries, is a leading provider of IT products, services, and solutions to businesses, government agencies, educational institutions, and healthcare facilities throughout the United States. PCM offers name-brand hardware and software products, as well as IT services and solutions, to its customers through multiple sales channels, including its dedicated team of Account Executives.

3. VPC is a Wisconsin corporation with its corporate headquarters in Kenosha, Wisconsin.

4. VPC is a direct competitor of PCM. In particular, VPC's sales team markets and sells name-brand hardware and software products, as well as IT services and solutions, to businesses of all sizes and in the same markets as PCM.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.

6. Venue is proper pursuant to 28 U.S.C. § 1391 because VPC resides in this District and a substantial part of the events giving rise to this action occurred in this District.

## BACKGROUND INFORMATION

### PCM Hires Blake Reed

7. On February 13, 2013, PCM hired non-party Blake Reed ("Reed") to work as an Account Executive in its Chicago, Illinois sales office. Before starting at PCM, Reed executed an Employee Non-Competition, Non-Disclosure, and Non-Solicitation Agreement (the "Agreement'). A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

8. The Agreement contained a number of restrictive covenants barring Reed from certain post-employment conduct, including: (1) disclosing, using or disseminating PCM's confidential information; (2) soliciting or selling competing products or services to PCM's customers or prospects whom Reed serviced, developed relationships with, or acquired information about during his employment with PCM for a period of twelve months; and (3) working for a competitor of PCM for a period of twelve months. The Agreement also provided

that it would be "construed, governed and interpreted in accordance with the laws of the State of Ohio."

9. Reed's employment at PCM was his first job in IT sales. Accordingly, Reed's first title at PCM was Account Executive in Training. This was an entry level sales job that included classroom and on-the-job training, including sales and marketing techniques. On June 1, 2013, Reed transitioned out of PCM's training program and became an Account Executive.

10. As an Account Executive, Reed's job was to market and sell PCM's products and services directly to new and existing customers in the private and public sectors. Reed's primary duties included expanding the scope of PCM's relationships with existing customers; identifying and developing new customers, including from prospects developed through PCM's centralized advertising and marketing efforts; keeping abreast of customers' technology needs; advising customers and prospects on the products and services offered by PCM; registering deals (*i.e.*, being the first IT products and services provider to notify a manufacturer of a new sales opportunity and receiving preferential pricing in return); quoting prices for customers; placing orders; and ensuring that customers received and were satisfied with the products or services they purchased.

11. To help him succeed, PCM assigned Reed a number of existing and prospective customer accounts from its customer relationship management database, a centralized database containing comprehensive information about PCM's customers and prospects, including their contact information, particular technology needs and preferences, detailed purchasing history, and the prices they paid for PCM's products and services. While at PCM, Reed "owned" those

accounts, meaning he was the designated point of contact between PCM and those customers and prospective customers.

12. PCM also entrusted Reed with confidential information that informs its pricing strategy, including: PCM's product costs; margins; special vendor and manufacturer arrangements, including rebates and volume pricing; customer specific pricing and discounts; and deal registration pricing, which, as mentioned above, is the preferential price manufacturers give to the provider who first identifies a sales opportunity.

13. PCM's investment in Reed paid off, as evidenced by his increasingly productive sales numbers. From 2013 to 2015, Reed's sales increased seven-fold. Even though Reed was employed by PCM for just 11 months in 2015, he still ranked among the top 3 in sales out of the approximately 50 to 80 Account Executives in PCM's Chicago office.

**VPC Recruits Reed**

14. On or about November 11, 2015, while Reed was living and working in Illinois, VPC employee Bryan Sullivan called Reed to recruit him to work for VPC. The following morning, Reed sent himself a Microsoft OneNote document he created containing confidential information about 63 of PCM's customers and prospects, including contact information for the persons responsible for IT purchasing, supplier quotes and pricing information, deal registration information and expiration dates, and customer contact notes detailing customer order histories, IT needs and preferences, and planned hardware and software purchases, by sending an email from his PCM computer and email account to his personal email account. Reed did this so that he could contact those customers after he left PCM.

4
4821-9050-2232.2
Case 2:18-cv-01230-JPS    Filed 08/10/18    Page 4 of 11    Document 1

15. On November 17, 2015, Reed received a second call from Mr. Sullivan. Shortly thereafter, Reed emailed a copy of his resume, most recent paycheck, and his 2014 W2 and earnings statement—all of which showed Reed was a current PCM employee—to VPC's Sales Leader, Kevin Brubaker. VPC requested Reed's paycheck and earnings statement to corroborate the amount of business Reed claimed he had at PCM.

16. Based on Reed's successful performance at PCM, VPC invited Reed to its Kenosha, Wisconsin office for an interview on November 20, 2015. During the interview, VPC explained that under its compensation structure—comprised of a base salary and sales commissions—Reed could make more money at VPC than at PCM.

17. At the time VPC interviewed Reed, it knew that IT product and service resellers, including PCM, routinely require their sales employees to execute employment agreements containing restrictive covenants. Despite this knowledge, VPC did not ask Reed whether he had an employment agreement with PCM.

18. At approximately the same time he was applying for a position at VPC, Reed accepted an employment offer from Insight Enterprises, Inc. ("Insight"), another of PCM's competitors. Unlike VPC, Insight asked whether Reed had an employment agreement with PCM and made its offer of employment contingent on Reed's obtaining a waiver from PCM of the non-compete provision contained in the Agreement.

19. On November 23, 2015, Reed resigned from PCM. In an email to his supervisors, Reed falsely claimed he was quitting because "he had way to much going on right now in my life and I need a break from work." In reality, Reed quit so he could work for one of PCM's competitors.

20. On December 2, 2015, Reed emailed PCM's Human Resources department requesting a waiver of the non-compete provision contained in the Agreement so that he could work for Insight. PCM has a strong interest in making sure the restrictive covenants contained in its employment agreements are enforced, and therefore denied Reed's request for a waiver. As a result, Insight withdrew its offer.

21. On December 7, 2015, Reed received an offer of employment from VPC for the position of Sales Executive. As a Sales Executive at VPC, Reed's job duties would be the same as they were at PCM. Unlike Insight's offer of employment, VPC's offer was not contingent on Reed obtaining a waiver from PCM of the non-compete provision contained in the Agreement, and Reed did not ask PCM for such a waiver.

22. Following VPC's initial offer, Reed negotiated with VPC for a higher base salary due to the "book of business" he would bring with him from PCM. VPC agreed to give Reed a higher base salary during his first 90 days of employment, and reiterated that under its standard compensation structure, Reed stood to make more at VPC than at PCM.

23. On December 29, 2015, Reed emailed Mr. Brubaker indicating that while he was happy with the proposed compensation package, he was "really worried" about his non-compete agreement with PCM "because [of] the book of business [he] would bring over." Mr. Brubaker alerted VPC's owner and CEO, Nick Preuss, about Reed's concerns, but VPC did not take any steps to learn about the details of the Agreement and chose to hire Reed notwithstanding the Agreement.

24. In a subsequent phone conversation with Mr. Brubaker, Reed again expressed his concern regarding his employment agreement with PCM, but VPC did not take any steps to learn about the details of the Agreement and chose to hire Reed notwithstanding the Agreement.

25. On January 4, 2016, Reed accepted VPC's offer of employment.

26. On January 11, 2016, Reed began working for VPC and immediately began soliciting business from his former PCM customers. That same day, one of those customers informed PCM that Reed had contacted it in an effort to take its business from PCM to VPC.

27. On January 12, 2016, another of Reed's former PCM customers warned Reed to "be careful" because PCM was aware of his activities. Reed responded that he would be careful and that VPC was "behind [him] 100 percent too."

28. On January 13, 2016, PCM's counsel sent a letter to Reed and VPC reminding them of Reed's obligations under the Agreement and stating that PCM would sue to enforce the terms of the Agreement if necessary. A true and correct copy of the January 13, 2016 letter is attached hereto as **Exhibit B**.

29. Upon receiving the letter, VPC instructed Reed to retain counsel and to turn over any confidential information he had taken from PCM to his attorney. VPC referred Reed to its own legal counsel, the law firm of Rose & deJong, whom Reed ultimately retained.

30. Notwithstanding the letter from PCM, VPC did not to terminate Reed. VPC also did nothing to stop Reed from soliciting business from his former PCM customers.

**Litigation History**

31. On January 22, 2016, at approximately 8:50 AM, VPC responded to PCM's letter stating that it had not yet determined what action it would take regarding Reed but that it would

decide shortly. Less than one hour later, Reed commenced a declaratory judgment action against PCM in the Circuit Court of Kenosha County, Wisconsin.

32. On February 17, 2016, PCM filed a coercive action against Reed and VPC in the United States District Court for the Northern District of Illinois, asserting claims for breach of contract, breach of duty of loyalty, conversion, and tortious interference with prospective business relations claims against Reed, and a tortious interference with contract claim against VPC.

33. On February 18, 2016, PCM removed the Wisconsin action to the United States District Court for the Eastern District of Wisconsin and then, on February 22, 2016, moved to dismiss the Wisconsin Complaint as an improper anticipatory action. That same day, Reed moved to dismiss or stay the Illinois action on the grounds that his Wisconsin action was filed first.

34. On March 11, 2016, VPC moved to dismiss PCM's tortious interference with contract claim on the grounds that the United States District Court for the Northern District of Illinois did not have personal jurisdiction over VPC.

35. On March 24, 2016, VPC agreed to loan Reed money to cover his attorney's fees in the Wisconsin and Illinois actions, which loan would be repaid out of Reed's commissions and wages. In the event Reed left VPC's employ, he agreed to repay the loan at an interest rate of 18 percent per annum, the highest rate VPC could charge under the law.

36. On July 22, 2016, Judge Lynn Adelman granted PCM's motion to dismiss the Wisconsin action, finding that Reed had improperly filed the anticipatory suit in Wisconsin to try to take advantage of favorable Wisconsin law governing employment agreements and deprive

8
4821-9050-2232.2
Case 2:18-cv-01230-JPS    Filed 08/10/18    Page 8 of 11    Document 1

PCM, the natural plaintiff, of its chosen forum. Reed's motion to dismiss or stay the Illinois action was subsequently denied as moot.

37. On October 24, 2016, Judge John Tharp of the Northern District of Illinois granted VPC's motion to dismiss PCM's tortious interference with contract claim, without prejudice, on the ground that the Court did not have personal jurisdiction over VPC.

38. On December 22, 2016, PCM moved for summary judgment on all of its claims against Reed.

39. On September 28, 2017, Judge Tharp granted PCM summary judgment on its breach of contract and breach of duty of loyalty claims but denied summary judgment on its conversion and tortious interference with prospective business relations claims. With respect to PCM's breach of contract claim, the Court found that the Agreement was valid and enforceable and that Reed had breached it by (1) working for VPC in a position substantially identical to the position he held at PCM; (2) stealing PCM's confidential information and using it to make sales for VPC; and (3) soliciting his former PCM customers on behalf of VPC. The Court ordered specific performance of the Agreement but did not enter judgment as to the amount of PCM's monetary damages. A true and correct copy of the Court's Memorandum Opinion and Order is attached hereto as **Exhibit C**.

40. VPC terminated Reed on October 11, 2017.

41. On December 4, 2017, Reed filed for bankruptcy. As a result, PCM's claims against Reed were stayed.

42. To date, PCM has incurred approximately $277,751.32 in attorneys' fees and costs enforcing the Agreement against Reed, none of which it would have incurred if VPC had not intentionally interfered with the Agreement between PCM and Reed.

43. During the first 11 months he was employed by VPC, Reed sold approximately $1,128,609 worth of IT products and services to 21 of his former PCM customers, generating at least $52,858 in profits for VPC. During the same period, PCM saw a 64% decrease in average monthly sales revenues from those same 21 customers. Those customers would not have shifted their business from PCM to VPC if VPC had not interfered with the Agreement between PCM and Reed.

44. Additionally, the Agreement includes a fee-shifting provision which states, "in the event that I breach this Agreement, I shall be liable for all damages, attorneys' fees and costs suffered by PCM." As a result of Reed's breach of the Agreement and VPC's tortious interference with the Agreement, PCM suffered significant damages, including, but not limited to, attorneys' fees, and costs.

## COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT

45. PCM realleges each and every allegation herein contained.

46. The Agreement between Reed and PCM is a valid and enforceable contract.

47. VPC knew of the Agreement prior to hiring Reed on January 4, 2016.

48. VPC was further informed of the Agreement by way of PCM's January 13, 2016 letter.

49. VPC intentionally interfered with the Agreement between PCM and Reed.

10
4821-9050-2232.2
Case 2:18-cv-01230-JPS    Filed 08/10/18    Page 10 of 11    Document 1

50. VPC knew, or reasonably should have known, that its conduct was substantially certain to interfere with the Agreement between PCM and Reed.

51. VPC's interference was not justified or privileged.

52. As a result of VPC's interference, Reed breached the Agreement.

53. As a result of VPC's interference, PCM was thrust into litigation with Reed to enforce the Agreement.

54. As a direct and proximate result of VPC wrongful actions, PCM has suffered and will continue to suffer damages in excess of $75,000.

## DEMAND FOR JURY TRIAL

55. PCM respectfully demands trial by jury.

WHEREFORE, PCM prays that the Court enter judgment against VPC and award damages to PCM in an amount to be proved at trial, including its costs, attorneys' fees, prejudgment and post-judgment interest, and for such other and further relief as the Court may deem just and proper.

Dated: August 10, 2018   NILAN JOHNSON LEWIS PA

By:   s/ Courtney E. Ward-Reichard
Courtney E. Ward-Reichard (WI #1064681)
Katie M. Connolly (MN #0338357)
Matthew C. Murphy (MN #391948)
120 South 6th Street, Suite 400
Minneapolis, MN 55402
(612) 305-7500
cward@nilanjohnson.com
kconnolly@nilanjohnson.com
mmurphy@nilanjohnson.com

ATTORNEYS FOR PLAINTIFF