# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PCM SALES INC.,

                Plaintiff,

v.

VANTAGE POINT CORPORATION,

                Defendant.

Case No. 18-CV-1230-JPS

**ORDER**

## 1.    INTRODUCTION

The parties are competitors in the business of providing IT services to businesses. Plaintiff alleges that Defendant scalped one of its employees, Blake Reed ("Reed"). In a prior action filed in the Northern District of Illinois ("NDIL"), Plaintiff sued Reed and Defendant for breach of contract, breach of a duty of loyalty, and tortious interference with contract. Plaintiff was granted summary judgment against Reed, who was enjoined from continuing to work for Defendant, but avoided paying damages by declaring bankruptcy. Defendant was dismissed from the case for lack of personal jurisdiction. After the NDIL case concluded, Plaintiff came to Wisconsin—Defendant's home state—to continue its quest to punish Defendant's conduct. Plaintiff proceeds on one claim: tortious interference with contract. The parties have filed cross-motions for summary judgment. (Docket #13 and #30). For the reasons stated below, Defendant's motion must be denied, and Plaintiff's must be granted in part.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "'create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.'" *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3. RELEVANT FACTS**

With the parties presenting dueling summary judgment motions, the Court's recitation of the facts will be largely neutral. The Court will only note the parties' disputes where they are particularly relevant. Plaintiff is a California corporation headquartered in that state. It also has a substantial presence in both Illinois and Ohio. Defendant is a Wisconsin corporation

located in Kenosha. Both are in the business of selling IT products and services, and they are direct competitors.

Reed began working for Plaintiff as a sales representative in 2013. Throughout his period of employment, Reed worked out of Plaintiff's Chicago office and lived in Illinois. His sales territory was initially nationwide, but later shifted to the upper Midwest region. Reed was nevertheless permitted to keep his national customers.

Sales competition in this industry is intense and requires a great deal of time and effort to develop relationships and build brand loyalty. When Reed began with Plaintiff, it assigned him a number of existing customer accounts to get him started. Reed also generated his own leads and inputted confidential customer information into Plaintiff's database. Plaintiff trusted Reed with these customers and a great deal of confidential proprietary and customer information.

These relationships and this confidential information would clearly be valuable to Plaintiff's competitors. Plaintiff therefore takes strides to keep the information secret. Its network is secured and segmented so that users can only see information relevant to their work. Of central importance to this case, Plaintiff also requires its employees to sign contracts with confidentiality and non-competition clauses to ensure that its competitors do not covertly gain access to sensitive information.

Reed was required to sign such an agreement (the "Agreement"). The Agreement prohibited Reed from sharing Plaintiff's confidential business and customer information. If he left Plaintiff's employ, Reed was further barred from soliciting Plaintiff's customers or working for a competitor without Plaintiff's permission. These restrictive covenants applied across the country and were set to endure for a year after Reed's

separation from Plaintiff, except for the confidentiality provision, which extended indefinitely. The Agreement included an Ohio choice-of-law provision.

Reed performed excellently for Plaintiff and his sales skyrocketed from 2013 to 2015. In November 2015, however, Reed began looking for greener pastures. The parties dispute Reed's precise motivations for moving on. It seems to have been a combination of unhappiness with his work for Plaintiff, combined with a desire for career advancement and better compensation.

Reed initially met with a company called Insight. In asking Plaintiff for relief from the non-competition clause of the Agreement, Reed stated that he "want[ed] to respect [Plaintiff's] employment agreement[.]" (Docket #37 at 1). However, in light of the competition in its industry, Plaintiff has a strong interest in enforcing its restrictive covenants and regularly does so. Plaintiff accordingly refused to release Reed from his restrictive covenants.

At about the same time, Reed contacted Defendant, which was open to the prospect of hiring him. Reed then copied some of Plaintiff's confidential information and e-mailed it to himself, for the admitted purpose of contacting those customers once he started with Defendant. The employment discussions with Defendant continued. Defendant never asked Reed about whether he had signed an employment agreement with Plaintiff, though Defendant regularly enters such agreements with its own employees.

Reed resigned his employment with Plaintiff at the end of November. He negotiated his position and compensation with Defendant on the basis of the "book of business" he was bringing with him. (Docket #24 at 21). Reed expressed related concerns about his non-compete

agreement with Plaintiff. Plaintiff alleges that Defendant again did nothing to learn more about the Agreement and did not refuse to hire Reed. Defendant maintains that it in fact told Reed not to solicit Plaintiff's customers. However, during his deposition, Defendant's employee who allegedly did so was inconsistent in his memory of such a conversation. *See* (Docket #23-7 at 32–33).

After he started with Defendant in January 2016, Reed immediately began soliciting his former customers to transfer their business from Plaintiff to Defendant. He utilized at least some of the information he stole from Plaintiff to contact these customers and finalize sales for Defendant. In his first year with Defendant, Reed contacted more than half of his former customers, including almost all of his best customers, and generated more than one million dollars in sales from them.

Plaintiff learned of Reed's treachery almost immediately. It contacted Defendant and Reed, demanding that Reed stop using the confidential information and that he be terminated. Plaintiff provided Defendant a copy of the Agreement at that time so that Defendant could review the restrictive covenants for itself.

Defendant refused Plaintiff's demand and sued Plaintiff in Wisconsin state court, seeking declaratory judgment that the Agreement's restrictive covenants were void. Plaintiff filed a separate lawsuit in the NDIL against Reed for violating the Agreement, and against Defendant for tortiously interfering with the Agreement. Defendant's Wisconsin action was removed to this Court and dismissed as an improper anticipatory suit. *Reed v. PCM Sales, Inc.*, Case No. 16-CV-191-LA, 2016 WL 9412449 (E.D. Wis. July 22, 2016). For its part, Defendant obtained its dismissal from the NDIL action by successfully arguing that personal jurisdiction was lacking. In

light of the dismissal of the Wisconsin case, Reed decided to present the same claim in the NDIL as a cross claim.

In September 2017, Judge Tharp of the NDIL resolved the parties' cross-motions for summary judgment. *PCM Sales, Inc. v. Reed*, Case No. 16-CV-2334, 2017 WL 4310666 (N.D. Ill. Sept. 28, 2017). The court's first order of business was to decide what law applied to the parties' dispute: the Agreement chose Ohio law, the court was situated in Illinois, and Reed had moved to Wisconsin to work for Defendant. *Id.* at *4. Plaintiff argued for Ohio law, which it believed would enforce the restrictive covenants, while Reed contended that Wisconsin law controlled, and that Wisconsin would not enforce them. *Id.*

The court noted that under the Second Restatement of Conflicts of Laws, in contract cases,

> the parties' choice of law will be respected unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which [] would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* (quotations omitted). The court concluded that Ohio had an appropriately substantial relationship to the parties, such that the choice-of-law clause in the Agreement should be respected. *Id.* at *4–5.

Reed countered that the public policy of both Wisconsin and Illinois would not permit the enforcement of the restrictive covenants, regardless of Ohio's prerogative. *Id.* at *5. As for Wisconsin, its public policy disfavoring overbroad restrictive covenants is a matter of statute. *Id.* But Reed was mistaken in believing that Wisconsin law would apply in the

absence of the choice-of-law clause. *Id.* Rather, Illinois law would apply because, again using the factors of the Second Restatement, Illinois has a far greater connection to the Agreement than Wisconsin. *Id.* As aptly put by Judge Tharp, the "happenstance" that "Reed unilaterally decided to move to Wisconsin to compete with [Plaintiff] years after the agreement was signed . . . does not outweigh the substantial connection between the [Agreement] and Illinois." *Id.* The court then found that Illinois' public policy was not so clearly against the restrictive covenants as Reed contended. Instead, it concluded that Illinois policy would not prohibit the court from applying Ohio law in this instance. *Id.*

The court went on to find that the restrictive covenants were overbroad. *Id.* at *6–10. Ohio allows reformation of such covenants by the court, however, and Judge Tharp made changes to render the covenants enforceable. *Id.* The court granted summary judgment to Plaintiff on Reed's violation of the as-modified covenants. *Id.* at *10. It enjoined Reed from working for Defendant for just shy of one year and from otherwise competing with Plaintiff. *Id.* at *10–11. To avoid paying money damages, Reed filed for bankruptcy protection, and his prospective monetary liability to Plaintiff was discharged in March 2018.

As it did in the NDIL case, Defendant asserts that the restrictive covenants are overbroad for various reasons, including that they prohibit Reed from engaging in IT sales in segments that he rarely or never entered, such as sales to government agencies or large businesses; they apply to the huge number of companies in Plaintiff's customer database, whether or not Plaintiff had ever pursued that company for a potential sale; and they prevent Reed from working for a competitor in any capacity. The covenants also apply to companies which compete with any of Plaintiff's parents,

subsidiaries, or affiliates, which encompasses a broad spectrum of services having nothing to do with IT sales. Finally, Defendant notes that the confidentiality provision lacks appropriate temporal limitations.

Defendant also questions the extent of Plaintiff's damages by way of *Defendant's* conduct in this case, as opposed to Reed's conduct. For instance, Plaintiff has not produced complete invoices for the legal fees it incurred in the NDIL case. Additionally, Defendant posits that Plaintiff's customers left not because of Reed's solicitation, but because Defendant provides better service than Plaintiff. Thus, Plaintiff should not be heard to complain about losing those customers due to some unfair competitive activity by Defendant.

4. **ANALYSIS**

In Wisconsin, tortious interference with contract occurs when "(1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere." *Briesemeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. Ct. App. 2006). Defendant's motion seeks dismissal of this action solely on Plaintiff's inability to establish the first element—that an enforceable contract exists between Plaintiff and Reed. Plaintiff's motion requests judgment on its entire claim, contending that all of the elements are indisputably proven. The Court will begin by addressing the first element of the claim, and then the remaining elements together.

4.1 **An Enforceable Agreement**

The heart of this case is whether Plaintiff can show that the Agreement is enforceable. The legal issues entailed in answering this

question are layered and, indeed, inextricably interwoven, creating a level of complexity with which the parties have struggled in their briefing. The Court will, therefore, attempt to proceed in clear, stepwise fashion towards its conclusion that the Agreement is, indeed, valid and enforceable.

Wisconsin substantive law applies to Plaintiff's tortious interference claim generally, as Plaintiff has come to a Wisconsin court asserting a Wisconsin cause of action. The parties do not dispute this point. Further, they agree that for the choice-of-law decisions the Court must make in this case, it is bound to use Wisconsin's choice-of-law rules. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009).

Despite the overall application of Wisconsin law to Plaintiff's claim, Wisconsin also recognizes the principle of dépeçage, which is "the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis." *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 n.1 (7th Cir. 1996). Plaintiff urges the Court to apply dépeçage to this case, namely by engaging in a separate choice-of-law analysis as to which state's law governs the Agreement's enforceability. This is critical to Plaintiff because it has essentially conceded that the Agreement would be unenforceable in Wisconsin. *See* (Docket #15 at 13–30; Docket #22). Defendant counsels against dépeçage, noting that the principle does not apply when the issues in the case are inextricably intertwined. *See Boomsma v. Star Transp., Inc.*, 202 F. Supp. 2d 869, 878 (E.D. Wis. 2002).

To the extent that assertion is even a correct statement of law,[1] the Court agrees with Plaintiff that dépeçage is appropriate. The issue of the

---

[1] *Boomsma*, an opinion of a former district judge of this District, is Defendant's only support for the principle that dépeçage should not be applied when issues are "inextricably intertwined." (Docket #25 at 6); *Boomsma*, 202 F. Supp. 2d at 878. The opinion quotes this language not from any source of law, but

enforceability of the contract can easily be separated from whether Defendant's conduct satisfies any of the other elements of a tortious interference claim. Further, as explained below, Illinois has a far greater interest in this case than Wisconsin does on the issue of contract enforceability. It would be improper to apply Wisconsin law to a discrete issue—contract enforceability—when Wisconsin is only connected to that issue by "happenstance." *PCM Sales*, 2017 WL 4310666, at *5; *In re Air Crash Disaster Near Chi., Ill. on May 25, 1979*, 644 F.2d 594, 610–11 (7th Cir. 1981) ("Critical to conflicts analysis is the notion that we must examine the choice-of-law rules not with regard to various states' interests in general, but precisely, with regard to each state's interest in the specific question [at issue].").

Defendant suggests that it would "be unworkable and unfair to find a Wisconsin employer liable under Wisconsin law for hiring someone subject to a restrictive covenant that is unenforceable under Wisconsin law." (Docket #25 at 6). In other words, Defendant believes that it would be unfair to hold it liable for a Wisconsin tort based on a contract that Wisconsin would reject. The Court disagrees. Again, as explained below, Wisconsin's interest in the Agreement is greatly subordinated to that of Illinois. It is not, then, any unfairness to a Wisconsin employer subject to tort liability that matters. Instead, the need for fairness to contracting parties in Illinois demands dépeçage in this case.

Applying dépeçage, the Court must decide which state's law governs the Agreement's enforceability: Ohio, which is the jurisdiction

---

rather from a party's brief. *Boomsma*, 202 F. Supp. 2d at 878. No Wisconsin appellate courts, or the Seventh Circuit for that matter, have endorsed the "inextricably intertwined" phrase.

selected by the Agreement; Illinois, the place of contracting and the focus of the relationship between Plaintiff and Reed; or Wisconsin, Defendant's home state and where Reed came to work for Defendant. The Court begins, however, with some general principles. Like Illinois, Wisconsin follows the Second Restatement of Conflicts of Laws. Thus, Wisconsin parties are free to choose the law to govern their contracts, subject to the caveat that "[t]hey may not use their freedom to escape important public policies of a state whose law would be applicable if the parties' choice of law provision were disregarded." *Am. Fam. Mut. Ins. Co. v. Cintas Corp. No. 2*, 914 N.W.2d 76, 82 (Wis. 2018).

The parties have selected Ohio law per the Agreement. To enforce that choice-of-law clause, the Court must be assured that Ohio law is not repugnant to the policies of the state whose law would apply in the absence of the clause. But which state is that: Illinois or Wisconsin? To decide which jurisdiction's law applies in a contract dispute, Wisconsin looks to the jurisdiction with the most significant relationship to the dispute. *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 670–71 (Wis. 2002). There is a weak presumption in favor of applying the forum state's law, so the non-forum state's contacts must be clearly more significant for the Court to choose that state's law to govern the dispute. *NCR Corp. v. Transp. Ins. Co.*, 823 N.W.2d 532, 534–35. (Wis. Ct. App. 2012). Thus, the Court begins by slightly favoring application of Wisconsin law.

Determining which state has the "most significant relationship" to the Agreement involves two steps. First, the Court considers the relevant "grouping of contacts," which include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence,

nationality, place of incorporation and place of business of the parties." *Id.* at 535. Critically, "[i]f one state's contacts are clearly more significant, we may terminate our analysis [here] and apply that state's law." *Id.* at 536. However, "if it is not clear that the nonforum contacts are of greater significance, then the court applies five choice-influencing factors: (1) Predictability of results; (2) Maintenance of interstate and international order; (3) Simplification of the judicial task; (4) Advancement of the forum's governmental interests; and (5) Application of the better rule of law." *Drinkwater v. Am. Fam. Mut. Ins. Co.*, 714 N.W.2d 568, 576 (Wis. 2006).

The "grouping of contacts" test is precisely what Judge Tharp applied in the NDIL case. *PCM Sales*, 2017 WL 4310666, at *5. He concluded that the contacts strongly favored Illinois:

> Reed signed the employment agreement in Illinois for the purpose of working in [Plaintiff's] Chicago office, which he did for two years under the agreement. By contrast, the only connection between the employment agreement and Wisconsin is the fact that Reed unilaterally decided to move to Wisconsin to compete with [Plaintiff] years after the agreement was signed. That happenstance does not outweigh the substantial connection between the employment agreement and Illinois.

*Id.* This Court agrees entirely with Judge Tharp and would state the point even more emphatically. Illinois is the only state with an interest in the Agreement; Wisconsin has nothing to do with it.

Defendant all but concedes that the "grouping of contacts" would lead to a selection of Illinois law. *See* (Docket #25 at 14; Docket #41 at 13). Instead, Defendant emphasizes three points that it believes mandate application of Wisconsin law regardless. First, Defendant asserts that in cases involving a confluence of tort and contract issues, like this one, the "grouping of contacts" test includes an additional consideration: "the

locations of the injurious conduct and injury." *NCR Transp.*, 823 N.W.2d at 535–36. Defendant maintains that this factor points squarely to Wisconsin, and that it is "a major factor that should be given great weight because it is where all actions alleged to have been taken by [Defendant] took place." (Docket #25 at 14–15).

This Court has applied dépeçage to separate the contract enforceability issue from Plaintiff's larger tort claim. Thus, the Court believes that this final factor should not weigh as strongly as Defendant believes. *See NCR Transp.*, 823 N.W.2d at 535–36 (announcing the factor, but there was no dépeçage issue in the case, and similarly, no dépeçage concerns in the cases cited in support of the rule, *Drinkwater* and *Beloit Liquidating Trust v. Grade*, 677 N.W.2d 298 (Wis. 2004)). Moreover, the Court only agrees with Defendant's assessment of this factor in part. While Wisconsin is where Reed went to work for Defendant, the effect of Reed's work—the source of Plaintiff's injury—was not limited to that state. In the end, the Court concludes that this factor does not overcome the overwhelming weight of contacts between the Agreement and Illinois.

Second, Defendant argues that the "choice-influencing factors" favor application of Wisconsin law, founded primarily on the state's policy against restrictive covenants. Wis. Stat. § 103.465 (restrictive covenants are "enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer," and any unreasonable restrictions are "illegal, void, and unenforceable[.]"). But the Court need not assess the "choice-influencing factors" because the result of the "grouping of contacts" test is clear. Illinois' contacts are clearly more significant than Wisconsin's.

Defendant's second contention is that even if the Court finds that Illinois law would apply in the absence of the Ohio choice-of-law provision, this case is in a Wisconsin forum, and Wisconsin's public policy against enforcing the Agreement's restrictive covenants completely prohibits doing so to Defendant's detriment in this case. In other words, Defendant believes that the strength of Wisconsin's policy would cause that state to ignore its own choice-of-law rules and assert its own law as dominant. This exact argument was considered, and rejected, by the Seventh Circuit in *In re Jafari*:

> Appellants seem to argue that regardless of the result of the "grouping of contacts" test, if enforcing nonforum law would contravene Wisconsin public policy, a Wisconsin court will refuse to do so and will apply Wisconsin law instead. . . . Most of their cases stand for the proposition that the freedom to contract for choice-of-law is qualified because parties cannot override public policies of the state whose law would apply absent the choice-of-law clause. . . . In *Drinkwater*, the court determined that the express choice-of-law provision for Iowa law contravened Wisconsin policy, and that the contract would not control if the "significant contacts" choice-of-law analysis led to a determination that, "absent the clause, Wisconsin law would apply." *Drinkwater*, 714 N.W.2d at 574. The court then conducted its choice-of-law analysis and determined that absent the clause Wisconsin law would apply. The court therefore voided the forum selection provision as contrary to public policy. The court never suggested that if it had determined that Iowa law would have applied under a grouping of contacts analysis, it nevertheless would have applied Wisconsin law to enforce Wisconsin public policy. Indeed, we find no authority for the conclusion that a Wisconsin court that determines through a significant contacts choice-of-law analysis that the nonforum state's law should apply nevertheless will apply Wisconsin law if enforcing nonforum law would contravene Wisconsin public policy.

569 F.3d 644, 650–51 (7th Cir. 2009). Put differently, once a Wisconsin court, namely this court sitting in diversity, determines that another state's law applies to a case or an issue therein, Wisconsin's interest in the issue terminates, insofar as its law and public policies are concerned. Not only is this Court bound to apply *Jafari* as binding precedent, but the opinion makes eminent sense here. Defendant cannot hide behind the shield of Wisconsin policy when Wisconsin has no interest in the issue at hand.

The Court finds, then, that Illinois law would apply in the absence of the Ohio choice-of-law provision. This is, again, precisely what Judge Tharp determined in his opinion. Judge Tharp went on to scrutinize the Agreement under Ohio law, making certain modifications to render the Agreement valid, and enforcing the agreement as modified. *PCM Sales*, 2017 WL 4310666, at *6–10. Having reviewed Judge Tharp's analysis, and being given no reason to disagree with it by the parties, the Court concurs that the Agreement is enforceable under Ohio law with the modifications supplied by him.

Defendant makes a final stand against the Agreement's enforceability on policy grounds. It asserts that allowing enforcement of the Agreement as modified is inherently unpredictable, because a Wisconsin company will not know what a particular out-of-state employment contract will look like after a court is finished modifying it. Defendant laments that this will inhibit Wisconsin employers from hiring employees from other states who are subject to restrictive covenants that may be unenforceable in Wisconsin, because the employer risks those covenants being rendered enforceable by modification. The Court rejects these concerns for two reasons. First, Defendant's beliefs about equity cannot overcome the legal precepts described above. Second, Defendant's policy contentions are

baseless because they rely on *Wisconsin* policies which are not implicated in this case. Put simply, Defendant refuses to believe that Wisconsin has no interest in the Agreement's enforceability. Defendant is wrong.

In sum, Plaintiff is entitled to summary judgment on the first element of its claim, that it had an enforceable contract between itself and Reed. Defendant's motion, which sought dismissal solely on the ground that the first element was lacking, will be denied.

### 4.2   Defendant's Interference and Intent, Plaintiff's Damages, and Defendant's Justification

Plaintiff also seeks judgment in its favor on the remaining four elements of its tortious interference claim. Again, these are that "2) the defendant interfered with [the Agreement], (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere." *Briesemeister*, 720 N.W.2d at 542. When viewing the evidence and all inferences therefrom in a light most favorable to Defendant, the Court concludes that there are pending disputes of material fact as to each of these elements. Defendant certainly has not "persuade[d] the court that [its] case is convincing," *Waldridge*, 24 F.3d at 921, but it need not do so at this stage. The jury will be called upon to determine Defendant's intent, causation, and the precise scope of Plaintiff's damages,[2] which are all matters particularly suited for assessment by a factfinder.

---

[2]In its reply in support of its own summary judgment motion, Plaintiff states that "[t]o win summary judgment, all [Plaintiff] must show for this element is that a single act of [Defendant] caused [Plaintiff] some amount of damages; a determination of a specific damages amount can wait." (Docket #44 at 11). But this is not what Plaintiff's motion actually requests. It is not presented as a motion for partial summary judgment. Rather, Plaintiff presents a motion for *complete* summary judgment and asks that the Court grant its motion and promptly enter judgment in its favor. (Docket #30; Docket #31 at 30). The Court will hold Plaintiff

## 5. CONCLUSION

In light of the foregoing, Defendant's motion for summary judgment will be denied, and Plaintiff's motion will be granted in part. The Court will also grant the parties' motions to seal their summary judgment submissions. (Docket #12, #19, and #36).

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #13) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment (Docket #30) be and the same is hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order; and

**IT IS FURTHER ORDERED** that the parties' motions to seal (Docket #12, #19, and #36) be and the same are hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 12th day of July, 2019.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

---

to its word; the Court will not grant partial summary judgment as to liability only when this was not expressly requested.